**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RAYATH CHOWDHURY, individually and on behalf of all others similarly situated,
*Plaintiff*,
v.
GEMINI SPACE STATION, INC., GEMINI TITAN, LLC, GEMINI OLYMPUS, LLC, WINKLEVOSS CAPITAL FUND, LLC, CAMERON WINKLEVOSS, and TYLER WINKLEVOSS,
*Defendants*.

Case No. 1:26-cv-10404

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

## TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ........ 1

PARTIES ........ 9

JURISDICTION AND VENUE ........ 13

FACTUAL ALLEGATIONS ........ 13

I. Gemini's Sports Betting Operations ........ 13

II. Gemini's product is unlawful sports betting. ........ 19

III. Lawful Sports Betting in New York ........ 20

IV. Gemini dupes consumers into thinking they are legally trading against other consumers, when they are often actually gambling against Gemini and its partners. ........ 25

V. Even if consumers were only gambling directly against other consumers, Gemini would still be profiting off of them by operating an illegal sportsbook. ........ 30

VI. Illegal gambling is addictive and dangerous, especially when consumers do not have proper safeguards. ........ 32

VII. States are cracking down on Gemini's unlawful sports betting. ........ 38

VIII. The Winklevoss Defendants personally direct, promote, and profit from Gemini's illegal sportsbook. ........ 39

CLASS ALLEGATIONS ........ 42

CLAIMS FOR RELIEF ........ 48

I. CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS ........ 48

PRAYER FOR RELIEF ........ 53

JURY DEMAND ........ 54

1. Plaintiff Rayath Chowdhury brings this action, individually and on behalf of all others similarly situated, against Defendants Gemini Space Station, Inc., Gemini Titan, LLC, and Gemini Olympus, LLC (collectively, "Gemini" or the "Gemini Entities"), Cameron Winklevoss and Tyler Winklevoss (collectively, the "Winklevoss Defendants"), and Winklevoss Capital Fund, LLC ("WCF") to recover wagers from Defendants' illegal sports gambling operation. Plaintiff alleges the following upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and upon information and belief, including investigations conducted by his attorneys, as to all other matters.

## NATURE OF THE ACTION

2. Defendants own and operate an online and app-based platform, branded "Gemini Predictions," that they market as a "prediction market." In actuality, however, Gemini operates an unlicensed sports gambling platform, which is accessible to any resident of the United States who is over the age of 18.[1] By engaging in an unlicensed sports betting operation, Defendants have violated numerous state gambling laws, engaged in illegal deceptive activity, and unjustly enriched themselves at the expense of hundreds of thousands of consumers. Accordingly, Plaintiff and a Class of similarly situated individuals bring this lawsuit to recover their wagers, as well as costs and attorneys' fees.

3. Gemini offers sports betting in all 50 states to anyone over the age of 18, regardless of state laws prohibiting sports gambling or requiring betting platforms to be licensed. There's a reason these state laws were enacted: researchers have known for years about the dangers of gambling addiction. And recent research on gambling addiction highlights the

[1] *See* Paul Skidmore, *Gemini Review 2026*, Deadspin (Oct. 5, 2026), https://deadspin.com/prediction-markets/gemini-predictions/ (Gemini Predictions is "available throughout all the states to traders aged 18 or older").

particularized danger sports betting poses to young people, particularly those under 21 years old, including addiction and suicidal ideation.[2] Young people are particularly vulnerable because their brains are still developing and gambling stimulates the brain's reward system.[3]

4. Gemini provides unrestricted access to sports betting to 18-to-20-year-olds. Even states that permit regulated sports betting (like New York) generally prohibit 18-to-20-year-olds from gambling, and require certain safeguards to mitigate the risk that an individual will fall into compulsive behavior. Gemini not only allows young people who are particularly vulnerable to gambling addiction to bet on its platform—it actively markets itself to them through social-media advertising, cash promotions, and founder endorsements. Gemini profits from their wagers and their addiction.

5. Consumers place bets on Gemini on the outcome of sports games, individual player metrics, team results, and/or a combination ("combos," *i.e.*, parlays). These bets do not differ materially from bets available at casinos or sportsbooks. For example, Gemini has offered consumers the ability to wager on whether the New York Mets would win a baseball game by more than 1.5 runs (a classic "spread" bet) as well as on college basketball games such as the February 25, 2026 game between St. John's University and the University of Connecticut. Gemini promotes its football offerings through a dedicated "NFL Trading Hub," live in-game markets, and prepackaged NFL "combos."[4]

---

[2] *See* Lia Nower et al., *Daily Fantasy Sports Players: Gambling, Addiction, and Mental Health Problems*, J. Gambling Stud., Sept. 2018, at 727-37.

[3] *See* Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, Monitor on Psych., July/August 2023, at 62, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain.

[4] *See* Kyle Collins, *Best NFL Prediction Market Apps: Ranked September 2026*, Sports Illustrated (Oct. 30, 2026), https://www.si.com/prediction-markets/usa/apps/nfl (describing

6. Since at least January 8, 2026, Gemini has been classifying online sports bets on its platform as "event contracts," claiming this allows it to operate even in states where online sports betting is categorically illegal.[5] But calling sports betting "event contracts" is a distinction without a difference where consumers are placing bets on the outcome of events over which they have no control, to which they do not bring any particularized skill to bear, and which have no relationship to economic markets.

7. Gemini's illegal online sportsbook is growing rapidly. According to public reports, Gemini's prediction market processed more than 329 million contracts between its December 2025 launch and October 21, 2026, up from 100 million contracts in May 2026 and 225 million contracts in mid-August 2026.[6] Upon information and belief, sports markets constitute the single largest category of contracts that Gemini lists.[7]

8. Gemini's President, Defendant Cameron Winklevoss, has proclaimed that "[p]rediction markets have the potential to be as big or bigger than traditional capital markets," and in August 2026 described prediction markets as "the largest near-term growth opportunity on the platform," citing the sports season ahead.[8]

---

Gemini's "Dedicated NFL Trading Hub, NFL combos and live game updates built into the Gemini app").

[5] *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'* NY Times (Oct. 5, 2025), https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html.

[6] *See* Estefano Gomez, *Gemini's prediction markets pass 329 million contracts traded*, Crypto Briefing (Oct. 21, 2026), https://cryptobriefing.com/gemini-prediction-markets-329-million-contracts/.

[7] *See* Cole Rush, *Gemini Review – Prediction Market Features, Safety, and How It Works*, Bonus.com (Oct. 19, 2026), https://www.bonus.com/prediction-markets/gemini/.

[8] *See* Tanya Chepkova, *Gemini Calls the Segment That Brought In $500,000 Its Biggest Growth Opportunity*, Finance Magnates (Aug. 14, 2026), https://www.financemagnates.com/cryptocurrency/exchange/gemini-calls-the-segment-that-brought-in-500000-its-biggest-growth-opportunity/.

9. Sports betting drove Gemini's growth. In a February 5, 2026 blog post, the Winklevoss Defendants boasted that "10,000+ users" had "traded over $24m" since Gemini launched Gemini Predictions three months earlier, in mid-December 2025.[9]

10. In New York, where Gemini is headquartered, operating a sports betting platform is illegal without a license, and Gemini does not have one. No Gemini entity has ever been licensed by the New York State Gaming Commission in any capacity. Licensing plays an important role in sports betting because sports betting is a form of gambling, a highly addictive behavior. Licenses allow the state to maintain gaming integrity, regulate who wagers money (including restricting minors and compulsive gamblers), and prevent unfair or misleading advertising. Without such oversight, sportsbooks are able to mislead the public, including duping consumers into thinking they are not engaging in the highly addictive behavior of gambling when they are, creating betting lines with extremely poor odds of winning, misrepresenting consumers' chances of winning, and ultimately collecting money from consumers who do not realize the implications of their bets.

11. New York's chief law enforcement officer has come to the same conclusion. In April 2026, the Attorney General of the State of New York commenced an enforcement proceeding against Gemini Titan, LLC, alleging that Gemini's prediction market is an unlicensed gambling business that accepts wagers from New Yorkers in violation of New York's prohibitions on promoting gambling and possessing gambling records, the Racing, Pari-Mutuel

[9] *See* Tyler and Cameron, *Gemini 2.0: A Bridge to the Future of Money and Markets*, Gemini (Feb. 5, 2026), https://www.gemini.com/es/blog/gemini-2-0-a-bridge-to-the-future-of-money-and-markets.

Wagering and Breeding Law, and the federal Interstate Wire Act.[10] Nonetheless, Gemini continues to operate its illegal sports betting platform out of its New York City headquarters to residents of all states.

12. Other state regulators agree. In September 2026, the Connecticut Department of Consumer Protection issued a cease-and-desist order to Gemini directing it to immediately stop advertising, offering, promoting, or otherwise making available sports event contracts or any other unlicensed online gambling to Connecticut residents.[11] Connecticut officials alleged that the targeted operators permitted underage wagering, accepted bets on regular-season games of Connecticut college teams, and sent advertising to people on the State's list of individuals who had opted out of betting because of problems with gambling addiction.[12] Rather than contest the order, Gemini limited its sports contracts in Connecticut.[13] In October 2026, the Ohio Casino Control Commission likewise ordered Gemini to cease offering sports event contracts in Ohio, explaining that such unlicensed wagers "lack the protections Ohio law requires, particularly for young and vulnerable people."[14]

---

[10] *See Attorney General James Sues Coinbase and Gemini for Running Illegal Gambling Platforms in New York*, Office of the New York Attorney General (April 21, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-sues-coinbase-and-gemini-running-illegal-gambling; *New York sues prediction markets Coinbase and Gemini Titan, calls their operations gambling*, Reuters (Apr. 21, 2026), https://www.reuters.com/legal/government/new-york-sues-coinbase-financial-markets-gemini-titan-allegedly-violating-state-2026-04-21/.

[11] *See* Sergey Demidov, *Webull Pulls Sports Prediction Markets From Connecticut*, RG.org (Oct. 25, 2026), https://rg.org/news/prediction-markets/webull-exits-connecticut-sports-prediction-markets.

[12] *See* Ken Dixon, *Three prediction market companies have stopped operating in Connecticut after state crackdow*n, CT Insider (Oct. 7, 2026), https://www.ctinsider.com/politics/article/connecticut-prediction-market-companies-leave-ct-22460358.php.

[13] *Id.*

[14] *See* Neha Soni, *Ohio sends cease-and-desists to prediction market operators*, SiGMA World (Oct. 7, 2026), https://sigma.world/news/ohio-cease-desist-prediction-market/.

13. Courts have rejected the idea that prediction markets are immune from state gambling laws. The Ninth Circuit, Sixth Circuit, and Fourth Circuit recently rejected arguments that the Commodities Exchange Act ("CEA") preempts state gambling laws,[15] And on information and belief the Second Circuit is likely to do the same: the Southern District of New York denied the prediction market Kalshi's motion for a preliminary injunction against the New York State Gaming Commission, and held that New York's gambling laws, as applied to sports event contracts, are not preempted by the CEA.[16] Along the same lines, 39 States and the District of Columbia joined a brief that urges the United States Supreme Court to confirm that prediction markets offering sports gambling are subject to state gambling laws.[17]

14. The National Council on Problem Gambling, a non-profit that seeks to minimize the economic and social costs associated with gambling addiction, also wrote a letter to the CFTC raising concerns that prediction markets such as Gemini's could harm problem gamblers because of insufficient age restrictions, betting limits, or other safeguards for sports betting. The Council stated that "[f]rom a problem gambling standpoint, betting on futures is functionally gambling."[18]

15. When Gemini announced its prediction market on December 10, 2025, it described its offerings as "simple yes or no questions on future events," such as "Will 1 bitcoin

---

[15] *KalshiEX LLC v. Assad*, No. 25-7516, 2026 WL 2543846 (9th Cir. Aug. 28, 2026); *KalshiEX LLC v. Schuler*, Nos. 26-3196, 26-5235, 2026 WL 2884087 (6th Cir. Sept. 25, 2026); *KalshiEX LLC v. Martin*, No. 25-1892, 2026 WL 3544548 (4th Cir. Nov. 18, 2026).
[16] *KalshiEX LLC v. Williams*, No. 25 Civ. 8846 (AT) (S.D.N.Y. July 7, 2026).
[17] *See* Ashley Ahn, *Bipartisan coalition of states urge Supreme Court to let them regulate prediction markets*, Politico (Oct. 7, 2026), https://www.politico.com/news/2026/10/07/bipartisan-coalition-of-states-urge-supreme-court-to-let-them-regulate-prediction-markets-01110875.
[18] National Council on Problem Gambling, *Re: Prediction Markets Roundtable*, March 10, 2025, https://www.cftc.gov/media/11956/NationalCouncilonProblemGambling031025/download

end this year higher than $200k," and framed the product as part of an effort toward "building a one-stop financial super app."[19]

16. But less than a month later, on January 8, 2026, Gemini began offering wagers on College Football Playoff semifinal games and the NFL's Wild Card weekend,[20] and it quickly expanded to professional and college basketball, professional hockey, professional tennis, and other sports—all without obtaining a sports betting license from any state. By September, Gemini began offering and heavily promoting multi-leg parlay bets, calling them "combos."[21] Sports gambling, not hedging economic risk, has since become a centerpiece of Gemini's marketing.

17. The Winklevoss Defendants cannot take shelter behind Gemini's corporate structure. The Winklevoss Defendants own, fund, and direct the Gemini Entities (together and through WCF) as a single enterprise, and they used that control to cause the Gemini Entities to operate the unlicensed sportsbook that took wagers from Plaintiff and the Class.[22]

18. Under New York law, a court may pierce the corporate veil where "1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and

---

[19] *See* Dustin Gouker, *News: Gemini Gets CFTC Approval For Prediction Market*, Event Horizon (Dec. 10, 2025), https://nexteventhorizon.substack.com/p/news-gemini-gets-cftc-approval-for.

[20] *See* Jason Brow, *Gemini Adds Sports Markets To Crypto App But Liquidity Lags*, DeFi Rate (Jan. 12, 2026), https://defirate.com/news/gemini-adds-sports-markets-to-crypto-app-but-liquidity-lags/.

[21] *See* Mike Breen, *Gemini rolls out build-your-own combo tool for prediction markets*, Next.io (Sep. 22, 2026), https://nextpredict.io/market-news/industry/gemini-custom-combo-tool-prediction-markets/.

[22] *See Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91, 97 (E.D.N.Y. 1998) (quoting *Morris v. N.Y. State Dep't of Taxation & Fin.* , 82 N.Y.2d 135, 141 (1993)) (piercing the corporate veil is "is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners").

2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[23] It is enough that the domination was used to commit a "wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of Plaintiff's legal rights."[24] And the veil may be pierced to reach both the individual owners and the other owner-controlled entities.[25]

19. The Winklevoss Defendants sit atop every layer of the Gemini enterprise. WCF holds 100% of Gemini's Class B stock and approximately 94.5% of Gemini's total voting power as of April 20, 2026.[26] And because the Winklevoss Defendants control a majority of its voting power, Gemini is a "controlled company" under Nasdaq rules.[27] The Winklevoss Defendants also hold top offices at Gemini Titan, LLC and WCF, and run Gemini, its subsidiaries, and WCF out of the same headquarters at 600 Third Avenue in New York. And, as alleged below, they finance Gemini through WCF on terms they set on both sides of the table, and they personally directed the launch and expansion of the sports wagering that injured Plaintiff and the Class.

---

[23] *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).

[24] *Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*, 402 F. App'x 623, 626 (2d Cir. 2010) (quoting *Elec. Switching Indus., Inc. v. Faradyne Elec. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)).

[25] *See Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139–40 (2d Cir. 1991); *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 197 (2d Cir. 2005) (veil piercing may be used to reach the assets of either the individual owners or the other owner-controlled corporate entities).

[26] *See* Tanya Macheel, *Gemini surges after Winklevoss Capital Fund invests $100 million in the crypto exchange*, CNBC (May 14, 2026), https://www.cnbc.com/2026/05/14/gemini-surges-after-winklevoss-capital-invests-100-million-in-the-crypto-exchange.html.

[27] *See* Emily Jarvie, *Winklevoss twins-led crypto firm Gemini files for US IPO*, Proactive (Aug. 18, 2025), https://www.proactiveinvestors.com/companies/news/1076882/winklevoss-twins-led-crypto-firm-gemini-files-for-us-ipo-1076882.html.

20. Gemini has disclosed that it has "historically relied on related party loans, primarily from WCF, to fund certain aspects of [its] business,"[28] and that it "regularly enters into lending agreements with WCF . . . in order to finance operations, maintain regulatory capital levels in subsidiaries, and fund capital expenditures to grow the business."[29] Because the Winklevoss Defendants sit on both sides of every transaction between WCF and Gemini, those dealings are not at arm's length.

21. The Winklevoss Defendants personally made, announced, and promoted the decision to launch Gemini Predictions and to expand it into sports, parlays, and in-game betting. By housing the unlicensed sportsbook in Gemini while holding the enterprise's equity and collateral in WCF, the Winklevoss Defendants have positioned the proceeds of the illegal sportsbook to flow up to themselves. Plaintiff and the Class were injured as a direct result: they lost the money they wagered on Gemini's platform. Tyler Winklevoss, Cameron Winklevoss, and WCF are therefore liable, jointly and severally, for the obligations of the Gemini Entities alleged herein, in addition to the Winklevoss Defendants' direct liability for their own participation in the wrongdoing.

22. By operating unlicensed sports betting businesses, Defendants have violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched themselves at the expense of thousands of consumers. Accordingly, Plaintiff and a Class of similarly situated individuals bring this lawsuit to recover their wagers, as well as costs and attorneys' fees.

## PARTIES

[28] Gemini Space Station, Inc., Registration Statement (Form S-1/A) (2025), https://www.sec.gov/Archives/edgar/data/2055592/000110465925085963/tm255912-15_s1a.htm.
[29] *Id.*

23. Plaintiff Rayath Chowdhury is a natural person and a citizen of the State of New York. He opened an account on Gemini's platform and, beginning on approximately May 19, 2026, wagered and lost money on sports event contracts offered through Gemini Predictions. He was not informed by Gemini of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on Gemini's platform. He was not presented with, and did not knowingly agree to, any arbitration agreement, class-action waiver, or other "legal terms" with Gemini during the account creation process or at any other time.

24. Defendant Gemini Space Station, Inc. is a Nevada corporation with its principal place of business at 600 Third Avenue, 2nd Floor, New York, NY 10016. Gemini Space Station, Inc. is the corporate parent of Defendant Gemini Titan, LLC and Defendant Gemini Olympus, LLC. Together with the other Gemini entities, Gemini Space Station, Inc. operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Gemini operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

25. Defendant Gemini Titan, LLC is a Delaware limited liability company with its principal place of business at 600 Third Avenue, 2nd Floor, New York, NY 10016. Gemini Titan is an affiliate and wholly owned subsidiary of Gemini Space Station, Inc. Gemini Titan operates Gemini Predictions, a gambling platform, and promotes, accepts, and receives wagers on a variety of sports, culture, election, and other events. Gemini Titan has never been licensed by the New York State Gaming Commission in any capacity. Together with the other Gemini entities, Gemini Titan operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Gemini operates its business primarily through its

headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of service.

26. Defendant Gemini Olympus, LLC is a Delaware company headquartered at 600 Third Avenue, 2nd Floor, New York, NY 10016. Upon information and belief, it is an in-house clearinghouse for Gemini Titan LLC, and is a wholly owned subsidiary of Gemini Space Station Inc. Together with the other Gemini entities, Gemini Olympus, LLC operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Gemini operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

27. Defendant Tyler Winklevoss is a natural person and a citizen of the State of New York. Tyler Winklevoss is a co-founder of Gemini, the Chief Executive Officer and a director of Gemini Space Station, Inc., and, upon information and belief, the Chief Executive Officer and Chair of Gemini Titan, LLC.[30] Tyler Winklevoss and his brother, Defendant Cameron Winklevoss, are the co-founders and principals of Winklevoss Capital Fund, LLC, and they exercise shared voting and dispositive control over its holdings, which include all of Gemini Space Station, Inc.'s Class B common stock and approximately 94% of the combined voting power of Gemini Space Station, Inc.'s outstanding common stock.[31] Upon information and belief, Tyler Winklevoss directs Gemini's operations from Gemini's headquarters in New York, New York. As alleged below, Tyler Winklevoss personally directs, controls, participates in, promotes, and profits from Gemini's illegal sports wagering operation.

28. Defendant Cameron Winklevoss is a natural person and a citizen of the State of

[30] *Id.*
[31] *Id.*

New York. Cameron Winklevoss is a co-founder of Gemini and the President and a director of Gemini Space Station, Inc., and, upon information and belief, serves as President of Gemini Titan, LLC.[32] Through Winklevoss Capital Fund, LLC, Cameron Winklevoss shares with Tyler Winklevoss voting and dispositive control over approximately 94% of the combined voting power of Gemini Space Station, Inc. Upon information and belief, Cameron Winklevoss directs Gemini's operations from Gemini's headquarters in New York, New York. As alleged below, Cameron Winklevoss personally directs, controls, participates in, promotes, and profits from Gemini's illegal sports wagering operation.

29. Defendant Winklevoss Capital Fund, LLC ("WCF") is a Delaware company headquartered at 600 Third Avenue, 2nd Floor, New York, NY 10016. WCF is managed by Tyler and Cameron Winklevoss, and it is the vehicle through which the Winklevoss Defendants hold and exercise control over Gemini. WCF holds all 75,126,784 shares of Gemini Space Station, Inc.'s Class B common stock and 7,142,857 shares of its Class A common stock, and it is Gemini's principal related-party lender. Upon information and belief, WCF's members are Tyler and Cameron Winklevoss or entities they own and control, and WCF's business is directed by them from New York. As alleged herein, WCF is the alter ego of the Winklevoss Defendants and of the Gemini Entities and is liable for the obligations of the Gemini Entities alleged herein.

30. At all relevant times, each Defendant acted in concert with, and as the agent, alter ego, co-conspirator, and/or aider and abettor of, each other Defendant in operating Gemini's unlicensed sports wagering enterprise. The Gemini Entities share common ownership, management, headquarters, branding, and a single integrated platform, and they are dominated and controlled by the Winklevoss Defendants, directly and through WCF. For the reasons

---

[32] *Id.*

alleged above, the corporate veils of the Gemini Entities and WCF should be pierced. Each Defendant is therefore liable for the acts and omissions of the others alleged herein. The Winklevoss Defendants are also independently liable because they personally participated in, authorized, and directed the wrongful conduct alleged herein.

## JURISDICTION AND VENUE

31. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from at least one Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

32. The Court has personal jurisdiction over Defendants because Gemini and WCF are headquartered in this District, the Winklevoss Defendants reside in New York, where they direct Gemini's business, and the wrongful conduct by Defendants occurred in and emanated from this District. The Court has personal jurisdiction over WCF because it is directed by the Winklevoss Defendants from New York, has repeatedly funded Gemini at its New York headquarters, and is the alter ego of Defendants headquartered in and residing in this District.

33. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in and/or conduct business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I. Gemini's Sports Betting Operations

34. Gemini was co-founded by Defendants Cameron and Tyler Winklevoss and began as a cryptocurrency exchange.[33] Gemini operates both a website and mobile application out of its New York City headquarters. Through Gemini Titan, Gemini claims to operate a prediction market for event contracts, which it calls "Gemini Predictions."

35. A "prediction market" allows for the purchase and sale of "event contracts." Event contracts are "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). In other words, event contracts pay out if a future event does (or does not) occur.

36. According to Defendant Cameron Winklevoss, Gemini "started as a Bitcoin company, became a crypto company, and [is] now building the super app for the markets economy."[34] Gemini's prediction market is now the centerpiece of that strategy.

37. Gemini's contracts allow a bettor to take a "Yes" or "No" position on whether a future, real-life event will occur by purchasing a "Yes" or "No" contract at a price in cents that reflects the probability assigned to each outcome. If the bettor's predicted event occurs, Gemini pays the bettor $1.00 per contract; if it does not occur, the bettor receives nothing. Gemini takes money from each wager placed.

---

[33] *See* Leo Schwartz, *Winklevoss-led Gemini agrees to return over $1 billion to customers in deal with N.Y. regulator that includes $37 million fine*, Fortune (Feb. 28, 2024), https://fortune.com/crypto/2024/02/28/winklevoss-gemini-genesis-adrienne-harris-dfs-silbert-dcg/.

[34] See *Gemini Space (GEMI) Q1 2026 Earnings Call Transcript*, Yahoo Finance (May 15, 2026), https://finance.yahoo.com/markets/stocks/articles/gemini-space-gemi-q1-2026-204305074.html.

38. Soon after its prediction market launched, Gemini moved quickly to prioritize the markets most likely to make Gemini as much money as possible. On December 10, Gemini Predictions went live, and Gemini announced that it was "now live across all 50 US states," including to consumers in New York.[35] Then, on January 8, 2026, Gemini began offering illegal sports betting styled as event contracts. Gemini announced that it was offering bets on College Football Playoff games and, as an inducement, that "for a limited time, eligible users in the US can earn up to $250 for hitting specific trading benchmarks."[36]




39. Gemini's official accounts also advertised its sports gambling venture to persons in New York and elsewhere, including through Twitter and TikTok. Gemini posted numerous advertisements leading up to the February 8, 2026 Super Bowl; solicited bets on New York

---

[35] *See Gemini Adds Prediction Markets to Financial Super App in US*, Pymnts (Dec. 15, 2025), https://www.pymnts.com/consumer-finance/2025/gemini-adds-prediction-markets-to-financial-super-app-in-us/.
[36] *See Gemini Predictions™ Unveils Contracts for Sporting Events*, Gemini (Jan. 8, 2026), https://www.gemini.com/es/blog/gemini-predictions-tm-unveils-contracts-for-sporting-events.

Knicks games, urging users to "trade the Indiana vs. New York game today"; and promised that if the Seattle Seahawks won the Super Bowl, it would give "$250 in BTC [Bitcoin] to one winner."




40. Gemini omits that the sports wagers it accepts are unlawful under the laws of New York and other states without a state license, which Gemini does not have.

41. By the 2026 NFL season, Gemini had expanded still further into illegal sports gambling. It now offers in-game ("live") markets whose prices update as games unfold, and promotes a "combo builder" option with prepackaged multi-leg "combos."




42. The language that Gemini uses in its ads mimics language known to gamblers. For example, Gemini advertised that "Everyone Loves a Long Shot" on a 150-foot billboard near the intersection of Park Avenue and 22nd Street in New York City to promote betting on the March 2026 NCAA basketball tournament.




43. The way that Gemini monetizes sports betting is through house rake, which it calls "fees."[37] Gemini charges consumers who wager on the platform a fee calculated using a

[37] "Rake" is a scaled commission fee taken by a casino operating a game. By taking a rake, the house wins every time a bet is placed. *See Rake*, EvenBet Gaming (Jan. 8, 2025), https://evenbetgaming.com/knowledge-base/rake/.

"Taker Rate" of 0.07.[38] This means that for every bet consumers take on Gemini, Gemini receives 7% in rake.

44. When convenient to it, Gemini tries to disguise its illegal gambling operation by using non-gambling terms like "trading," "predictions," or "combos" so consumers do not think they are gambling. In reality, "trading" sports contracts is just plain sports betting. And Gemini's "combos" are just classic parlays, where consumers combine multiple bets against a functional House, and are only paid out if they win all of them.

45. In a March 2026 poll from the national pollster Morning Consult, 81% of those polled stated that sports event contracts constitute gambling, 81% also responded that prediction markets should be regulated and taxed at the state level, and 77% were concerned that allowing 18-year-olds to wager "could" increase problem gambling in that demographic.[39]

## II. <u>**Gemini's product is unlawful sports betting.**</u>

46. Gemini's leadership promotes betting on sports. On February 8, 2026, Gemini's Chief Executive Officer, Defendant Tyler Winklevoss, posted about his own wager on Gemini's platform: "Have placed my Super Bowl prediction on the @Gemini app, now I'm monitoring the situation." Gemini then re-posted his message to its followers.

---

[38] *See Gemini Predictions Fee Schedule*, Gemini (Mar. 12, 2026), https://www.gemini.com/fees/predictions.

[39] *See* Brant James, Morning Consult Poll: *Prediction Markets Are Gambling, Should Be States' Purview*, InGame (Mar. 30, 2026), https://www.ingame.com/morning-consult-poll-prediction-markets/.




47. Gemini similarly lures consumers with cash inducements to bet. On January 9, 2026, Gemini advertised in a TikTok video that "for every $10 you put in the prediction market, we're giving $10 to you." On February 3, 2026, a few days before the Super Bowl, Gemini advertised that every $50 bet would earn an entry in a promotion to win $1,000.

## III. <u>Lawful Sports Betting in New York</u>

48. New York State bans all forms of gambling under the state constitution, except for specifically enumerated exceptions.[40]

49. Chapter 59 of the Laws of 2021 amended N.Y. Racing, Pari-Mutuel Wagering and Breeding Law ("PML") section 1367 and added section 1367(a) to authorize mobile sports wagering to licensed companies. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."

50. "Sports wagering" under New York law is defined as: "wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

51. Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401. The statute directed the Gaming Commission to conduct a competitive bidding process to award licenses to not less than two mobile sports wagering platform providers that would host no less than four mobile sports wagering operators.

52. In December 2021, the Commission awarded licenses for ten years to nine mobile

[40] New York State Constitution, Article I, § 9.

sports wagering operators at a tax rate of 51 percent. No Gemini entity is among the nine operators.[41]

53. The taxes from these licenses fund the Council on Problem Gambling, which monitors gambling addiction on the platforms, operates seven problem gambling resource centers across the state, and hosts events, workshops, and conferences to raise awareness regarding the risks and signs associated with problem gambling, and provides referrals to help addicts access appropriate services.[42]

54. In addition to levying heavy taxes on licensed mobile sports wagering operators, the law requires operators to implement measures to prohibit minors from participating in sports wagering activity, and the Commission tracks alleged occasions of underage participation on the licensed platforms.[43] Additionally, and in recognition that gambling is an addictive and potentially dangerous behavior, New York State has developed a robust self-exclusion program for individuals "who recognize that they should no longer participate in legal gambling."[44]

55. Pursuant to that law, the Commission also collects data and demographic information from sports wagering participants on legal platforms and those seeking help for gambling addiction.[45] This information includes:

a. Statistics and demographics regarding the number of individuals who accept problem gambling information upon entering voluntary self-exclusion;

b. Statistics and demographics relating to page interactions for individuals

---

[41] N.Y. State Gaming Comm'n, *Sports Wagering: Licensed Operators*, https://gaming.ny.gov/sports-wagering (last accessed Oct. 29, 2026).
[42] *Id.* at 6.
[43] *Id.* at 4.
[44] *Id.*
[45] *Id.* at 6-7.

who visit sports wagering licensees' problem gambling web pages;

c. Statistics and demographics of sports wagering participants who, upon annual notification of hitting the statutory deposit limit, opt to take a "break" or acknowledge the limit and continue play;

d. Gathering information about trends in gambling disorders;

e. Providing training specific to mobile sports betting for counselors including training on engaging family members; and

f. Identifying specific geographic regions or vulnerable populations in need of services and developing programming to address those specific needs.

56. Gemini evades all of these important consumer protections (and saves a lot of money in taxes) by offering unlicensed sports betting and pretending that it is equivalent to derivatives trading.

57. Consumers on Gemini stake or risk "something of value upon the outcome of a contest of chance or a future contingent event not under [their] control or influence, upon an agreement or understanding that [they] will receive something of value in the event of a certain outcome," in violation of Racing Law § 1367(1)(t) and within the meaning of N.Y. Penal Law § 225.00(2).

58. According to Racing Law § 1367-(a)(4)(b), "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." Gemini is operating an unlicensed sports wagering platform in New York, and advertising its unlicensed platform, including by erecting a billboard in Manhattan promoting wagering on the NCAA basketball tournament. Racing Law § 1367(16)(a) further prohibits any person not authorized under

Sections 1367 or 1367-a from knowingly offering or attempting to offer sports wagering or mobile sports wagering in New York. Gemini has done exactly that.

59. New York law further states, “A person placing a wager shall be at least twenty-one years of age.” PML § 1367(2)(d). Gemini allows “minors” (any person under age 21, PML § 1367(j)) to open accounts and wager on its platform; Gemini does not prohibit consumers between the ages of 18 and 21 from placing wagers.

60. And New York law prohibits wagering on “a sport or athletic event in which any New York college team participates regardless of where the event takes place.” PML § 1367(s). Gemini offers bets on “prohibited sports events” to consumers. *Id.* For example, Gemini offered wagering on the February 24, 2026 college basketball game between the University at Buffalo and the University of Akron and on the February 25, 2026 college basketball game between St. John’s University and the University of Connecticut.

61. Gemini is operating a sports wagering enterprise in violation of New York law. It is operating illegally, avoiding the robust taxes that New York levies on legally operating companies and sidestepping the tightly regulated environment that allows the state to monitor legalized gambling, identify problematic behavior, and act appropriately to ensure the legalized gambling experience is consistent with the values of the State of New York.

62. Gemini’s conduct also falls squarely within New York’s criminal prohibitions on bookmaking. A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity, N.Y. Penal Law § 225.05, and of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars, *id.* § 225.10. Upon information

and belief, Gemini routinely receives and accepts, in a single day, more than five bets totaling more than $5,000, including from individual consumers located in New York, and its website has displayed numerous professional and college sports contracts with more than $5,000 in betting volume.

63. Gemini also maintains the records of a bookmaking enterprise. It sends consumers email confirmations identifying the event wagered upon, the consumer's wager, the number of wagers, the amount wagered, the fees charged, a bet identification number, and the date and time of the bet; it maintains electronic records of all open and completed wagers; and it publishes daily "trade data" reflecting each wager placed. These are writings and articles "of a kind commonly used in the operation or promotion of a bookmaking scheme or enterprise" that reflect more than five bets totaling more than $5,000. N.Y. Penal Law § 225.20.

64. Finally, Gemini accepts bets and wagers in New York from consumers located in other states, and transmits from New York information assisting in the placing of bets on sporting events and communications confirming winning wagers that entitle recipients to payment. By using the internet to transmit such bets, wagering information, and payment confirmations in interstate commerce while engaged in the business of betting or wagering, Gemini also violates the federal Interstate Wire Act, 18 U.S.C. § 1084(a).

## IV. **Gemini dupes consumers into thinking they are legally trading against other consumers, when they are often actually gambling against Gemini and its partners.**

65. Unregulated sports betting (of any kind) is illegal in New York. In sports betting, consumers gamble against a bookmaker ("the House") on performance statistics of athletes or teams participating in a sporting event. The House sets betting lines, and consumers bet on either side of the House lines. The House tends to be highly sophisticated, and aims to set accurate odds that give it the best chance of making money. The House also charges Vigorish ("the Vig"),

which is a fee charged for accepting a wager. In other words, sportsbooks pay out less for a winning bet than they take for a losing bet. The Vig and the sophistication of house betting lines make it very difficult for consumers to make long-term profits from sports betting.

66. Gemini seeks to make money by taking Vig (which it calls "fees") on bets placed by consumers and, upon information and belief, by placing consumers' bets against sophisticated market makers that Gemini recruits, contracts with, and pays to take the other side of those bets.

67. Even if consumers were betting only against other consumers on sports, Gemini operates a mobile sports wagering platform in violation of New York law, and illegally collects money from individuals placing sports wagers. *See infra* V.

68. The wagers available to Gemini's consumers are indistinguishable from those offered in casinos, sportsbooks, and other gambling establishments. Like a sportsbook, Gemini offers "moneyline" bets on which team will win a game, "spread" bets on margins of victory (such as whether the New York Mets would win by more than 1.5 runs), totals, and futures on championships and season awards. This is because Gemini, like most sportsbooks, offers bets keyed to betting lines.

69. A betting line is the baseline projected result for a sporting event. The sportsbook allows consumers to pick either side of the betting line. For example, if the Dallas Cowboys are listed as -2.5, and someone bets on them, they would get paid out if the Cowboys win by 3 or more points. The -110 odds show the payouts for a successful bet, factoring in the Vig. So, a $100 bet on one side, if correct, would pay out $190.91 ($90.91 profit), but a loss would cost the full $100.

70. If consumers bet equally on either side of a House line, the House profits by taking the Vig. Therefore, by setting a neutral betting line in the consumer market, the House

profits with minimal to no risk because consumers allocate themselves on either side of the line. If consumers disproportionately bet on one side of the House line, either the House moves the line, or the House shoulders additional risk against consumers. Sportsbooks employ highly sophisticated research teams to set optimal betting lines based on an understanding of the consumer market, not just the sporting events themselves.[46]

71. Upon information and belief, Gemini operates the same way: it relies on market makers that it recruits and pays to set betting lines based on projections of the consumer market (lines that mirror casino and sportsbook betting lines), and then Gemini profits off of the Vig ("fees") as consumers allocate themselves on either side of the line.

72. But Gemini's egregious violation of New York law goes further still. Consumers on Gemini do not only bet against each other—upon information and belief, they also bet against the House. Gemini engages in House betting through "market makers," which set betting lines and gamble against the consumer with Gemini's encouragement and financial support.

73. In 2026, Gemini tripled the number of "contracted market makers" on its prediction platform and introduced new maker and taker incentive programs.[47] Gemini offers "Liquidity Rewards," "Taker Rewards," and maker incentives that reward high-volume betting.[48] Gemini continues to pursue contracts with professional counterparties to stand on the other side

---

[46] *See* Patrick Cwiklinski, *How Do Bookmakers Determine Sports Odds?*, SportsBettingDime (June 10, 2025), https://www.sportsbettingdime.com/guides/betting-101/how-bookmakers-generate-odds/.
[47] *See* Mike Breen, *Gemini Plans Prediction Market Distribution Push After Bringing Clearing In-House*, DeFi Rate (Aug. 17, 2026), https://defirate.com/news/gemini-prediction-market-push-clearing-house/.
[48] *See* Sky Smith, *Gemini Predictions Promo Code for $100 Bonus October 2026 Covers*, https://www.covers.com/betting/prediction-sites/nfl-prediction-markets.

of retail consumers' bets.[49] These contracted market makers are not "peers"; they are part of the House.

74. In addition, Gemini's clearinghouse, Gemini Olympus, stands between buyers and sellers of every contract, guaranteeing payment and managing counterparty risk, so that Gemini itself controls the funds that are wagered, lost, and paid out on its platform.[50] In the second quarter of 2026, Gemini brought clearing of its prediction market fully in-house.[51]

75. Gemini operates using a model functionally indistinguishable from House betting in other illegal sportsbooks that the law expressly prohibits. While consumers may bet on either side of the House baseline in any sportsbook, the House sets the betting line, and profits from fees on consumers' bets. Upon information and belief, Gemini's market makers set the baseline.

76. To maximize returns, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them with financial benefits, reduced (or zero) fees, differing position limits, and enhanced access. These advantages greatly reduce market makers' financial exposure. As a result, individual consumers hardly stand a chance, all the while thinking they are just betting against other regular consumers.

77. Gemini's "combo" (parlay) bets further increase the wins for the House. Parlays traditionally produce the highest House return ("hold") in sports betting. Whereas straight bets

---

[49] *See* Breen, G*emini Plans Prediction Market Distribution Push After Bringing Clearing In-House*, *supra* 40.
[50] *Id.*
[51] *Id.*

produce a hold of approximately 5%, parlay betting can produce holds of up to 30%.[52] By offering consumers parlays against the House, Gemini dramatically increases its hold through illegal sports gambling. Gemini's parlays require multiple correct bets to win a large payout, but if any bet is wrong, consumers lose. Gemini actively promotes prepackaged NFL combos to its users.

78. Gemini's "combo" bets involve exponential growth, and require winning every bet placed in order to pay out.

79. Gemini has rolled out batch-order application programming interfaces ("APIs") and an upgraded "Predictions API."[53] Upon information and belief, these tools allow sophisticated market makers to quote against retail consumers' bets, including parlays, within fractions of a second, in a manner no ordinary consumer can match. This ends up functionally the same as any other parlay at any other sportsbook.

80. Gemini's business model is that it *wins every time its customers bet*.

81. When consumers place bets on Gemini, they usually face off against money provided by a sophisticated market maker on the other side of the ledger. Based on information and belief, Gemini's API gives market makers information about the consumer on the side of the ledger seeking to place the bet, allowing market makers to limit or refuse bets from consumers that they believe to be long-term winners. Gemini makes money both from market makers and consumers, though it takes a significantly larger fee from retail consumers. Ultimately, the House wins.

---

[52] *See* Viktor Kimble, *Same-Game Parlays Delivering Greater Holds for Sportsbooks*, Covers (Oct. 26, 2022), https://www.covers.com/industry/sportsbooks-increased-figures-same-game-parlays-october-26-2022.

[53] *See* Gomez, *Gemini's prediction markets pass 329 million contracts traded*, *supra* 6.

## V. Even if consumers were only gambling directly against other consumers, Gemini would still be profiting off of them by operating an illegal sportsbook.

82. Gemini bills its platform as an exchange on which users "trade" with one another, and claims that this distinguishes it from a sportsbook.

83. Gemini makes money every time consumers bet. If consumers bet more, then Gemini makes more money. And, upon information and belief, a substantial and growing share of Gemini's prediction market volume and revenue comes from unlicensed sports gambling.

84. Operating an unlicensed sports gambling platform for consumers to exchange bets, and taking a fee (the "Vig," or also sometimes called a "commission," or "rake") is also illegal.

85. A bookmaker can run a sportsbook through "exchange" or "pool" betting, where consumers' bets are matched with an opposing bet, and the House profits by taking money out of the payouts.

86. Nothing requires the House to be a direct participant in its gambling operation for the gambling operation to be illegal. For example, in poker, players play against each other, and the House collects a "rake" out of each player's buy-ins or winnings.[54] Or, in "pari-mutuel betting," commonly used in horse racing, consumers bet against each other, and the House takes a commission (a percentage of the bet).[55] These contests still have a House that profits from gambling, and would be illegal without a gaming license.

---

[54] *See* Jon Sofen, *What does rake mean in poker?*, Poker.org (July 14, 2021), https://www.poker.org/poker-strategy/poker-for-beginners/what-does-rake-mean-in-poker-aYPti7d1oOp8/ ("In all U.S. states, it is illegal for an unlicensed casino to charge rake in a poker game.").

[55] *See* Ed DeRosa, *What Does Pari-Mutuel Betting Mean In Horse Racing?*, TwinSpires, https://www.twinspires.com/betting-guides/what-is-pari-mutuel-betting/.

87. N.Y. General Obligations Law § 5-401, refers to "Illegal wagers, bets and stakes," and states: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

88. Under New York law, "Sports wagering" means "wagering on sporting events or any portion thereof," which includes, but is not limited to, "single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." Racing Law § 1367(1)(x).

89. Related to sports wagering, "Sports pool" means "the business of accepting wagers on any sports event by any system or method of wagering." *Id.*

90. Gemini operates an illegal sports wagering platform, offering single-game sports bets, combos (parlays), spread bets, money line bets, in-game wagering, futures, and straight bets. The definitions of "sports wagering" and "sports pool" apply to "any system or method of wagering," including taking a commission and pairing bets from either side of a betting line. *Id.*

91. Only a licensed operator may operate a sports pool, or accept sports wagers, upon approval and licensing by the New York State Gaming Commission (NYSGC). Racing Law § 1367 specifies: "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York." Racing Law § 1367-a(4)(b).

92. Further, "Bookmaking" means "advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events." Under N.Y. Penal Law § 225.00(9).

93. Regardless of whether Gemini bets directly or indirectly against consumers (see *supra* IV), it acts as a bookmaker and an unlicensed sports operator by running a gambling

platform, and accepting bets. Even if Gemini were just a platform for exchange betting, it would be an illegal sports betting platform.

94. The House wins. This is a widely recognized fact—casinos and online gambling sites like Gemini would not exist if they were not "winners." Gemini makes 7% of every bet a consumer "takes."

95. Because Gemini, through its affiliated clearinghouse, serves as a counterparty to every bet, standing between buyers and sellers, shouldering the credit risk of all bets, and paying winning bettors from funds it controls. And because it recruits and pays market makers that face off against consumers, Gemini and its partners are gambling "winners" and "stakeholders" at the expense of the consumer.

## VI. **Illegal gambling is addictive and dangerous, especially when consumers do not have proper safeguards.**

96. As detailed below, Gemini enables addictive gambling behavior by underage adults, problem gamblers, and others by enticing them to gamble with "free" money while assuring them that they are legally gambling against peers.

97. For example, Gemini has offered new users "50% back" on football bets up to $100, "up to $100 in Predict Cash," and an "Up to $100 Trade Match."[56] In other words, consumers are enticed to join the platform and bet on football because they will be receiving bonus funds.

98. Gemini's bonus offers come with conditions designed to drive betting volume. For example, to obtain Gemini's $100 football match, a user must place $200 in qualifying football wagers, and only contracts priced between 20 and 80 cents count toward that threshold.[57]

---

[56] *See* Rush, *Gemini Review*, Bonus.com, *supra* 7.
[57] *Id.*

99. New York (and other states that have regulated sportsbooks) requires sports gamblers to be, at a minimum, 21 to place a bet. New York also restricts advertising, marketing, and promoting mobile sports wagering to underage persons, including by prohibiting sports wagering ads on college or university campuses. *See* Racing Law § 1367-a(4)(e); 9 N.Y.C.R.R. §§ 5329.37, 5330.45. Gemini follows none of these rules: it accepts wagers from 18-to-20-year-olds and advertises on social media platforms popular with young people, such as TikTok.

100. At no point in the sign-up process does Gemini inform consumers that they will be gambling.

101. Thus, Gemini lures consumers onto its "prediction" platform, offering to match their contributions or provide "free" money upon a consumer signing up. Once signed up, consumers gamble without limits or guardrails against, upon information and belief, institutional market makers with privileged access while being charged a high Vig.

102. Gemini also has little to no restriction on how much someone can bet. States typically require sportsbooks to set daily, weekly, and monthly deposit limits to ensure that consumers' gambling does not get out of control. For instance, New York gaming law permits credit card deposits but limits bettors to $2,500 per year, absent a consumer acknowledging that they have access to resources and can set responsible gaming limits. Upon information and belief, Gemini imposes no comparable limits and permits consumers to fund wagers with cryptocurrency and other assets held in their Gemini accounts.

103. Gemini also cross-markets its prediction market to holders of its own consumer credit card: Gemini has disclosed that "[o]ver half of our predictions traders are also Gemini

cardholders."[58] With minimal limits on deposits, no limits on bets, and easy access to credit, consumers can lose life-destroying amounts of money on Gemini.

104. There is no evidence that Gemini follows other responsible gaming rules promulgated by state commissions, including, for example, New York's requirement that gaming operators provide "comprehensive employee trainings on responding to circumstances in which individuals present signs of a gambling addiction and . . . assess, prevent, and address problem gaming by . . . users." PML § 1367 (14).

105. Much like traditional sportsbooks, most consumers lose on Gemini because Gemini takes some of their money every time they bet.

106. Most consumers *lose* money on Gemini. Economic research has found that the legalization of sports betting "increases credit card balances, reduces available credit, increases lottery play, and decreases net investments in financial markets," and that "[t]hese effects are particularly pronounced among financially constrained households."[59] A New York State Office of Addiction Services and Supports report identified people ages 18 to 24 as a "high-risk population" for gambling addiction, and reported that, as of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers.

107. Research on gambling addiction has demonstrated the grave problems that arise for individuals participating in sports betting, including addiction, and suicidal ideation.[60]

---

[58] See *Gemini Space (GEMI) Q1 2026 Earnings Call Transcript*, Yahoo Finance, *supra* 27.
[59] Scott R. Baker et al., *Gambling Away Stability: Sports Betting's Impact on Vulnerable Households*, NBER Working Paper No. 33108, at 30 (Nov. 2024), https://www.nber.org/papers/w33108.
[60] *See An Explosion in Sports Betting Is Driving Gambling Addiction Among College Students*, The Ohio State University College of Social Work (Dec. 20, 2023),

Indeed, the rate of suicide by gamblers is an estimated 15 times higher than the overall population. Online gambling is associated with cardiovascular disease, hypertension, peptic ulcer disease, and loss of sleep, not to mention the financial losses inflicted by gambling exceed $115 billion annually in the U.S. today.

108. By stimulating the brain's reward system, gambling can lead to addiction and cause participants to risk valuable assets—*e.g.*, money—in hopes of getting something of even greater value.[61] Furthermore, parlays are especially popular with younger members of the sports betting community.[62] The minimum age to gamble on Gemini's platform is 18.[63]

109. Unregulated sportsbooks also risk the integrity of sports games. While regulated sportsbooks can monitor suspicious bets, there are not sufficient safeguards against players (directly or through proxies) placing bets through Gemini, especially where Gemini pretends to offer something other than gambling. Recent betting scandals, such as the indictment of NBA player Terry Rozier for allegedly purposefully leaving a game early and tipping off co-

https://csw.osu.edu/blog/2023/12/20/an-explosion-in-sports-betting-is-driving-gambling-addiction-among-college-students/.

[61] *See* Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, Monitor on Psych., July/August 2023, at 62, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain.

[62] *See* Emily Giambalvo, Kati Perry, and Aaron Steckelberg, *Americans can't stop betting parlays. Sportsbooks are cashing in*, Washington Post (Oct. 9, 2025), https://www.washingtonpost.com/sports/interactive/2025/parlay-popularity-odds-sportsbooks/ ("Parlays are particularly popular among young people. Standard parlays accounted for 82 percent of all wagers for bettors age 21 to 24 in New Jersey for 2020, the most recent year that data is available.").

[63] *See Gemini Review 2026*, Deadspin, *supra* 1.

conspirators to bet the "under" on his performance metrics, were detected by regulated sportsbooks.[64]

110. Professional sports leagues treat sports event contracts as sports betting, not derivatives trading. Professional sports leagues have long permitted players to participate in traditional financial futures markets, yet they have drawn a sharp and deliberate line at prediction markets. Major League Baseball (MLB) sent a memo directly to its players prohibiting engagement with baseball event contracts on prediction market platforms, framing participation as a violation of its longstanding sports betting policies.[65] The National Football League (NFL) has also expressed these concerns, stating that it views prediction markets the same way it views traditional sports betting.[66] The NFL further cautioned that sports event contracts could jeopardize the integrity of the game because they would not be subject to the same strict oversight as legalized sports betting.[67]

111. Market manipulation and insider betting have already been significant issues on prediction market platforms. For example, in October 2025, Coinbase CEO Brian Armstrong decided to publicly list off a series of words at the end of his earnings call ("Bitcoin, Ethereum,

---

[64] *See* Santul Nerkar, *N.B.A. Player Took $70,000 Bribe to Leave Game Early, U.S. Says*, NYTimes (May 28, 2026), https://www.nytimes.com/2026/05/28/nyregion/terry-rozier-nba-betting-scandal.html.

[65] *See* Bradford William Davis, *MLB Sent Memo Warning Players About Prediction Markets*, Front Office Sports (Dec. 5, 2025), https://frontofficesports.com/mlb-sent-memo-warning-players-about-prediction-markets/.

[66] Ben Horney, *NFL Warns Prediction Markets Are Sports Betting With Less Oversight*, Front Office Sports (Aug. 25, 2025), https://frontofficesports.com/nfl-prediction-markets-regulation-ban/.

[67] *Id.*

blockchain, staking, and Web3") because there were prediction markets betting on which words he would say.[68]

112. Thus, Gemini makes unlawful gambling widely available to the public through its online and mobile platforms, presenting broader swaths of the population with the attendant risks of gambling without any of the safeguards. The risk is particularly damaging as the average age of the population participating in these unlawful games skews younger, and as large sums of money are bet on sports games.[69]

113. Upon information and belief, Gemini does not display problem-gambling helpline information on its wager pages and advertisements. Comparatively, lawful New York sportsbooks must display clear responsible-gaming information and provide easy access to resources like 1-877-8-HOPENY in their advertisements. *See* 9 N.Y.C.R.R. §§ 5325.6, 5329.37, 5330.34. Beyond that, Gemini's user protection features, if any, fail to match the minimum protections required by legalized and licensed sports betting sites.

114. Meanwhile, by way of example, New York maintains a robust, legally binding self-exclusion list (e.g., a "blacklist") that sportsbooks must adhere to by refusing wagers from anyone on any self-exclusion list.[70] Upon information and belief, Gemini does not honor New York's self-exclusion list.

---

[68] *See* Emily Nicolle and Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), https://news.bloomberglaw.com/crypto/coinbase-ceo-stunt-exposes-vulnerability-in-prediction-markets.

[69] *See* David Purdum, *Sports betting prevalent among young adults, survey says*, ESPN (May 24, 2023), https://www.espn.com/sports-betting/story/_/id/37721222/sports-betting-prevalent-young-adults-survey-says.

[70] PML § 1367-a.

115. There is no evidence that Gemini follows other responsible gaming rules promulgated by state commissions, including for example New York's requirements that gaming operators provide "comprehensive employee trainings on responding to circumstances in which individuals present signs of a gambling addiction and . . . assess, prevent, and address problem gaming by . . . users."[71]

## VII. States are cracking down on Gemini's unlawful sports betting.

116. As discussed above, states are cracking down on Gemini's unlawful sports-betting operation. The New York Attorney General has sued Gemini Titan over its unlicensed gambling platform. Connecticut ordered Gemini to cease and desist offering sports event contracts, and Gemini withdrew its sports offerings from that State. Ohio ordered Gemini Titan to cease offering sports event contracts to persons located in Ohio by October 16, 2026, and has warned that failure to comply could result in administrative, civil, or criminal enforcement action.[72]

117. Additionally, in October 2023, the New York Gaming Commission adopted New York Rule 5602.1(a)(4), which explicitly outlaws this kind of "proposition betting," or bets made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's outcome. That regulation states that "[c]ontests shall not be based on proposition betting or contests that have the effect of mimicking proposition betting. Contests in which a contestant must choose, directly or indirectly, whether an individual athlete or a single team will surpass an identified statistical achievement, such as points scored, are prohibited."[73]

[71] PML § 1367(13)
[72] *See* Soni, *Ohio sends cease-and-desists to prediction market operators*, *supra* 14.
[73] N.Y. Comp. Codes R. & Regs. Tit. 9 § 5602.1(a)(4).

118. Plaintiff welcomes the crackdown, but it does not make Plaintiff, or members of the putative class, whole. Plaintiff and the Class seek the value of the money they paid into Gemini's illegal gambling platforms.

### VIII. **<u>The Winklevoss Defendants personally direct, promote, and profit from Gemini's illegal sportsbook.</u>**

119. Cameron and Tyler Winklevoss are not passive investors. They co-founded Gemini, serve as its President and Chief Executive Officer, respectively, sit on its Board of Directors, and, through WCF, hold all of Gemini Space Station, Inc.'s Class B common stock, which carries ten votes per share and gives them approximately 94% of the company's combined voting power.[74]

120. The Winklevoss Defendants personally made, announced, and championed the decision to launch Gemini's prediction market. Tyler Winklevoss announced Gemini Titan's CFTC designation as "the beginning of a new chapter for Gemini," and Cameron Winklevoss proclaimed that prediction markets could be "as big or bigger than traditional capital markets."[75] On Gemini's quarterly earnings calls, the Winklevoss Defendants have personally promoted the prediction market and its growth, with Tyler Winklevoss stating that "people love it" and that "we very much believe in this product."[76]

121. The Winklevoss Defendants also personally solicit sports wagering. As alleged above, on the day of the Super Bowl, Tyler Winklevoss publicly announced that he had placed his own Super Bowl bet on Gemini's app, and Gemini amplified that post to its followers. And

---

[74] *See Gemini Space Station, Inc., Prospectus filed pursuant to Rule 424(b)(7)*, *supra* 22.
[75] *See* Chepkova *Gemini Calls the Segment That Brought In $500,000 Its Biggest Growth Opportunity*, *supra* 8.
[76] *See Earnings call transcript: Gemini Q2 2026 miss sends shares lower in premarket*, Investing.com, https://www.investing.com/news/transcripts/earnings-call-transcript-gemini-q2-2026-miss-sends-shares-lower-in-premarket-93CH-4860929.

on February 5, 2026, the Winklevoss Defendants jointly authored a blog post touting that more than 10,000 users had wagered more than $24 million on Gemini Predictions since its launch.[77]

122. The Winklevoss Defendants stand to profit personally from Gemini's illegal sportsbook. In May 2026, after launching Gemini Predictions, they caused Winklevoss Capital Fund to purchase $100 million of newly issued Gemini stock, paid in approximately 1,258 bitcoin, increasing their beneficial ownership to approximately 65.1% of Gemini's Class A common stock on an as-converted basis.[78] Cameron Winklevoss explained that the investment was justified in part because "[w]hen we went public in September, we did not have a predictions marketplace. We do now."[79]

123. Gemini Predictions is not the first Gemini product that the Winklevoss Defendants marketed as safe while concealing its true risks. Gemini previously offered a program called "Gemini Earn," which it marketed to retail customers as a low-risk way to earn interest. In 2023, the New York Attorney General sued Gemini, alleging that Gemini "lied to investors" and that Gemini's own internal analyses showed that Genesis's financials were risky. In June 2024, Gemini agreed to return approximately $50 million to Gemini Earn investors, and it was banned from operating any cryptocurrency lending program in New York.[80] Earlier that year, the New York Department of Financial Services fined Gemini $37 million and required it

---

[77] *See* Tyler and Cameron, *Gemini 2.0: A Bridge to the Future of Money and Markets*, *supra* 9.
[78] *See* Vicky Ge Huang, *Gemini Receives $100 Million Investment From Winklevoss Twins, Reports Narrowing Losses*, WSJ (May 14, 2026), https://www.wsj.com/livecoverage/stock-market-today-dow-sp-500-nasdaq-05-14-2026/card/gemini-receives-100-million-investment-from-winklevoss-twins-reports-narrowing-losses-ZmmbCJN70X1vjQGtP6sK.
[79] See Gemini Space Station, Inc., Q1 2026 Earnings Call Transcript, *supra* 27.
[80] *See* Press Release, N.Y. Att'y Gen., *Attorney General James Recovers $50 Million from Crypto Firm Gemini for Defrauded Investors* (June 14, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-recovers-50-million-crypto-firm-gemini-defrauded.

to restore more than $1 billion to Earn customers, finding that Gemini failed to conduct due diligence on Genesis and made misleading representations to customers.[81]

124. Gemini also has a documented history of misleading federal regulators. In January 2025, the United States District Court for the Southern District of New York entered a consent order finding that Gemini violated the Commodity Exchange Act and made materially false or misleading statements or omissions to the CFTC in connection with the self-certification of a bitcoin futures contract, permanently enjoining Gemini from such conduct, and requiring it to pay a $5 million civil monetary penalty.[82] When Gemini and the CFTC later jointly asked the court to vacate that consent order, the court refused on October 15, 2026, explaining that "Gemini's highest officials willfully misrepresented material facts."[83]

125. The Winklevoss Defendants knew that the sports wagering they caused Gemini to offer is unlawful without a state license. No Gemini entity has ever obtained such a license. The New York Attorney General, the Connecticut Department of Consumer Protection, and the Ohio Casino Control Commission have each told Gemini that its sports contracts are illegal gambling, and a federal court of appeals has held that federal commodities law does not preempt state gambling laws. Yet the Winklevoss Defendants have caused Gemini to continue accepting sports wagers from consumers nationwide, including from New York.

126. Because the Winklevoss Defendants own and control Gemini, personally authorized, directed, and participated in the conduct alleged herein, personally solicited wagers,

---

[81] *See* Schwartz, *Winklevoss-led Gemini agrees to return over $1 billion to customers*, *supra* 26.
[82] *See* Press Release, CFTC, *Gemini Trust Ordered to pay $5 Million for Making False or Misleading Statements, Omissions to the CFTC*, Release No. 9031-25 (Jan. 13, 2025), https://www.cftc.gov/PressRoom/PressReleases/9031-25.
[83] See Sharon LaFraniere, *Judge Refuses to Reverse Penalties Against Crypto Firm With Ties to Trump Family*, N.Y. Times (Oct. 15, 2026), https://www.nytimes.com/2026/10/15/us/politics/crypto-court-ruling-gemini-trust-trump.html.

and personally profit from the wagers that consumers lose, each of them is a "winner," "stakeholder," and a person who promotes gambling transactions within the meaning of the statutes invoked below, and each is personally liable for the deceptive acts and practices alleged herein.

## CLASS ALLEGATIONS

127. **Class Definition:** Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(2), and (b)(3), Plaintiff brings this action on behalf of Plaintiff, a Nationwide Class and Statewide Classes (collectively, "the Class"), defined as follows:

> All persons in the United States who spent money by wagering on Gemini's mobile or web platforms.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

128. In addition to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure 23(c)(5), Plaintiff seeks to represent the following State Classes or subclasses as well as any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the time of class certification:

**New York State Class:** All persons in New York who spent money by wagering on Gemini's mobile or web platforms.

**Alabama Class:** All persons in Alabama who spent money by wagering on Gemini's mobile or web platforms.

**Arkansas Class:** All persons in Arkansas who spent money by wagering on Gemini's mobile or web platforms.

**California Class:** All persons in California who spent money by wagering on Gemini's mobile or web platforms.

**Connecticut Class:** All persons in Connecticut who spent money by wagering on Gemini's mobile or web platforms.

**District of Columbia Class:** All persons in the District of Columbia who spent money by wagering on Gemini's mobile or web platforms.

**Florida Class:** All persons in Florida who spent money by wagering on Gemini's mobile or web platforms.

**Georgia Class:** All persons in Georgia who spent money by wagering on Gemini's mobile or web platforms.

**Illinois Class:** All persons in Illinois who spent money by wagering on Gemini's mobile or web platforms.

**Indiana Class:** All persons in Indiana who spent money by wagering on Gemini's mobile or web platforms.

**Kentucky Class:** All persons in Kentucky who spent money by wagering on Gemini's mobile or web platforms.

**Maryland Class:** All persons in Maryland who spent money by wagering on Gemini's mobile or web platforms.

**Massachusetts Class:** All persons in Massachusetts who spent money by wagering on Gemini's mobile or web platforms.

**Michigan Class:** All persons in Michigan who spent money by wagering on Gemini's mobile or web platforms.

**Minnesota Class:** All persons in Minnesota who spent money by wagering on Gemini's mobile or web platforms.

**Mississippi Class:** All persons in Mississippi who spent money by wagering on Gemini's mobile or web platforms.

**Missouri Class:** All persons in Missouri who spent money by wagering on Gemini's mobile or web platforms.

**Montana Class:** All persons in Montana who spent money by wagering on Gemini's mobile or web platforms.

**New Hampshire Class:** All persons in New Hampshire who spent money by wagering on Gemini's mobile or web platforms.

**New Jersey Class:** All persons in New Jersey who spent money by wagering on Gemini's mobile or web platforms.

**New Mexico Class:** All persons in New Mexico who spent money by wagering on Gemini's mobile or web platforms.

**Ohio Class:** All persons in Ohio who spent money by wagering on Gemini's mobile or web platforms.

**Oregon Class:** All persons in Oregon who spent money by wagering on Gemini's mobile or web platforms.

**South Carolina Class:** All persons in South Carolina who spent money by wagering on Gemini's mobile or web platforms.

**South Dakota Class:** All persons in South Dakota who spent money by wagering on Gemini's mobile or web platforms.

**Tennessee Class:** All persons in Tennessee who spent money by wagering on Gemini's mobile or web platforms.

**Vermont Class:** All persons in Vermont who spent money by wagering on Gemini's mobile or web platforms.

**Virginia Class:** All persons in Virginia who spent money by wagering on Gemini's mobile or web platforms.

**Washington Class:** All persons in Washington who spent money by wagering on Gemini's mobile or web platforms.

**West Virginia Class:** All persons in West Virginia who spent money by wagering on Gemini's mobile or web platforms.

**Wisconsin Class:** All persons in Wisconsin who spent money by wagering on Gemini's mobile or web platforms.

129. **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class; Gemini has reported more than 20,000 prediction market users. Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

130. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class

include, but are not necessarily limited to the following:

a. Whether Gemini's sports markets constitute unlawful sports wagering under the New York Constitution and the New York Racing, Pari-Mutuel Wagering and Breeding Law;

b. Whether Plaintiff and each member of the Class lost money or anything of value on Gemini;

c. Whether Defendants violated sections 5-419 and 5-421 of the New York General Obligations Law;

d. Whether Defendants violated sections 349 and 350 of New York's General Business Law; and

e. Whether Defendants have been unjustly enriched as a result of their conduct.

131. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendants' wrongful conduct.

132. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing Defendants' games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to the Class.

133. **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same.

134. **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

135. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned through additional investigation and in discovery, and to add additional class representatives for the Statewide Classes.

## CLAIMS FOR RELIEF

## I. CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS

### NATIONWIDE COUNT I
### N.Y. GEN. OBLIG. LAW § 5-419
### Plaintiff Against All Defendants

136. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

137. Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

138. Plaintiff and each member of the Class deposited money into accounts created and controlled by Defendants for the purpose of engaging in unlawful betting and/or wagering.

139. Defendants were engaged in an unlawful enterprise wherein consumers paid to participate in unlawful betting and/or wagering.

140. Gemini offered bets or wagers contingent upon the happening of an event, was a "winner" by profiting from each of Plaintiff's and Class members' wagers, and, through its affiliated clearinghouse and accounts it controls, was the "stakeholder" in whose hands such wagers were deposited. The Winklevoss Defendants, who own and control Gemini, personally promoted wagering on its platform, and profit from the wagers that consumers lose, are likewise "winners" and/or persons to whom such wagers were paid.

141. Defendants operated their enterprise out of New York. Upon information and belief, Defendants processed online consumer payments in New York, and Gemini's user agreements include a New York choice-of-law clause.

142. Pursuant to § 5-419, Plaintiff and the Class have a right to recover from Defendants the monies deposited as part of Defendants' unlawful betting and/or wagering enterprise.

## NATIONWIDE COUNT II
## N.Y. GEN. OBLIG. LAW § 5-421
## Plaintiff Against All Defendants

143. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

144. Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

145. Plaintiff and members of the Class each lost and paid at least twenty-five dollars to Defendants by engaging in unlawful betting and/or wagering.

146. Gemini's sports event contracts are "games" within the meaning of the statute, and Gemini is a "winner" in each game.

147. Plaintiff and the Class lost the money they deposited by engaging in Defendants' unlawful betting and/or wagering games.

**NATIONWIDE COUNT III**
**N.Y. GEN. BUS. LAW § 349**
**Plaintiff Against All Defendants**

148. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

149. New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

150. New York General Business Law section 349 applies to Defendants because Defendants engage in consumer conduct by, *inter alia*:

a. Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

b. employing individuals in furtherance of its business;

c. soliciting individuals to become consumers of its product; and

d. Obtaining consumers' money in furtherance of its business.

151. Defendants violated section 349 by, *inter alia*, representing that Gemini Predictions is a lawful, federally regulated product available in all 50 states when its sports offerings are unlicensed and illegal; telling consumers that they are "trading" event contracts when they are actually gambling; promoting "free" money and matched funds to induce wagering without disclosing the risks of gambling; and concealing that consumers' bets are, upon information and belief, placed against market makers that Gemini recruits, contracts with, and pays.

152. Defendants' conduct was material because it was likely to deceive reasonable consumers about the probability of winning their bets, the lawfulness of Defendants' business and services offered, and whether they were engaged in an addictive behavior.

153. Defendants willfully misled Plaintiff and Class members and induced them to rely on Defendants' misleading statements and/or omissions.

154. Defendants accepted money from Plaintiff and the Class members to participate in unlawful wagering or betting.

155. Accordingly, Plaintiff and Class members acted reasonably in relying on Defendants' misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

156. Defendants acted intentionally, knowingly, maliciously, and in reckless disregard of Plaintiff's and Class members' rights.

157. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

158. Plaintiff and Class members seek all monetary and non-monetary relief allowed by law.

**NATIONWIDE COUNT IV**
**N.Y. GEN. BUS. LAW § 350**
**Plaintiff Against All Defendants**

159. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

160. Under N.Y. GBL § 350, "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

161. Under N.Y. GBL § 350-a, "false advertising' means advertising, including labeling, of a commodity or service that is misleading in a material respect.

162. Defendants engaged in a widespread public advertising campaign through social media, billboards, and digital platforms that was deceptive or misleading in material respects,

including but not limited to:

- Advertising that Gemini Predictions is legal "across all 50 US states" when it offers sports wagers that are unlicensed and unlawful under New York law and the laws of other states.
- Promoting the platform as a "regulated" exchange, while omitting the fact that it operates as an unlicensed gambling enterprise.
- Promoting "free" money—such as "for every $10 you put in the prediction market, we're giving $10 to you"—and sweepstakes entries tied to betting volume, while omitting that the vast majority of consumers lose money gambling.
- Advertising wagers on sports as "trading" and "predictions," while concealing that users were, upon information and belief, frequently matched against market makers that Defendants recruit, contract with, and pay.

163. Gemini's advertisements failed to reveal that the sports "prediction markets" offered are functionally identical to sports betting and carry the same risks of addiction and financial loss associated with unregulated gambling.

164. Gemini's advertisements were consumer-oriented and were likely to mislead a reasonable consumer acting reasonably under the circumstances into believing they were participating in a lawful financial exchange rather than an unlicensed sportsbook.

165. As a direct and proximate result of Defendants' false advertising, Plaintiff and the Nationwide Class Members were induced to deposit and lose money on a platform they would not have used had the true nature of the service been disclosed, and they will continue to suffer injury.

166. Under N.Y. GBL § 350-e(3), Plaintiff and the Nationwide Class Members are entitled to recover their actual damages or five hundred dollars ($500), whichever is greater.

167. Because Defendants willfully and knowingly violated this section, the Court should exercise its discretion to increase the award of damages to three times the actual damages (up to $10,000 per person).

**NATIONWIDE COUNT V**
**UNJUST ENRICHMENT**
**Plaintiff Against All Defendants**

168. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

169. Plaintiff and Class Members conferred benefits upon Defendants by paying Defendants to participate in their unlawful betting and wagering scheme.

170. Defendants appreciated or had knowledge of the benefits they received from Plaintiff and Class Members.

171. Plaintiff and Class Members reasonably understood that Defendants offered lawful, regulated markets under New York state law.

172. Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

173. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' benefits conferred.

174. Plaintiff and Class Members have no adequate remedy at law.

175. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that they received because of their misconduct.

**PRAYER FOR RELIEF**

176. Plaintiff, individually and on behalf of all others similarly situated, respectfully

requests that this Court enter an Order:

a. Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as class counsel;

b. Declaring that Defendants' conduct, as set out above, violates sections 5-419 and 5-421 of the New York General Obligations Law and sections 349 and 350 of the New York General Business Law;

c. Ordering Defendants to produce an accounting identifying each Class member and itemizing all bets placed, monies lost by Class members, and gains received by Defendants in connection with their sports wagering business;

d. Entering judgment against Defendants, jointly and severally, in the amount of the losses suffered by Plaintiff and each member of the Class;

e. Enjoining Defendants from continuing the challenged conduct;

f. Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

g. Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendants unjustly received;

h. Awarding reasonable attorney's fees and expenses; Awarding pre- and post-judgment interest, to the extent allowable;

i. Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

j. Awarding such other and further relief as equity and justice require.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: November 25, 2026 Respectfully submitted,

By: */s/ David Stellings*

David Stellings
Wilson M. Dunlavey
Jacob S. Miller
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
wdunlavey@lchb.com
jmiller@lchb.com